**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| OPTRONIC SCIENCES LLC, *Plaintiff*, | § § § | |
| v. | § | CASE NO. 2:24-CV-00577-JRG |
| BOE TECHNOLOGY GROUP CO., LTD., *Defendant*. | § § § | |

**CLAIM CONSTRUCTION ORDER**

In this patent case, Optronic Sciences LLC alleges infringement by BOE Technology Group of claims from four patents relating to display technology. U.S. Patent 7,688,934 relates to addressing the "clock coupling effect" in shift registers, which is the distortion of output signals due to capacitive coupling of a clock signal with the transistor generating that output. *See* '934 Patent at 1:55–62. U.S. Patent 8,208,084 provides a new physical layout for an array substrate that more efficiently uses space and thereby reduces costs for producing LCD display panels. '084 Patent at 2:30–36. U.S. Patent 8,502,757 relates "to an organic light emitting display having [a] threshold voltage compensation mechanism and driving method." '757 Patent at 1:10–12. Finally, U.S. Patent 8,604,471 attempts to mitigate the effects of using ultraviolet light during the manufacturing process, which can negatively affect the display quality. '471 Patent at 1:29–39.

The parties present twenty construction disputes for resolution, although many of the disputes involve similar issues. Having considered the parties' briefing, along with arguments of counsel at a November 25, 2025 hearing, the Court resolves those disputes as follows.

# I. BACKGROUND

## A. U.S. Patent 7,688,934

The ’934 Patent attempts to address the clock-coupling effect in then-conventional thin-film transistor liquid crystal display technology. More specifically, the patent addresses conventional shift registers used in that technology. Generally, a shift register is a digital logic circuit that stores and shifts multiple data bits either left or right with clock pulses. In the conventional technology, the clock signal could capacitively couple with other parts of the shift register and cause distortions in the output signal. For example, FIGS. 1B–1F (below) show the capacitive effect of two signals coupling with other components to causes distortions (B1, B2) in the output signal.




To address the problem—that is, “to optimize waveform output of the shift register,” ’934 Patent at 2:24–25—the patent teaches circuit arrangements and components that,

> [b]efore a waveform of either a first clock signal or a second clock signal employed by [a] pull-up module transits into a rising edge, [a] pull-down driving module employs a first periodic signal to turn on the pull-down module in advance for a specific period, and/or before the waveform of the first or second clock signal employed by the pull-up module transits into a falling edge, the pull-down driving module employs a second periodic signal to turn off the pull-down module in advance for a specific period.

’934 Patent at [57]. Adjusting the timing in this way “ensure[s] that the signal level output from the pull-up module . . . is timely pulled down to acquire an optimal waveform output of the gate pulse signal.” *Id.* at 8:21–23.

The four claim-construction disputes from this patent come from Claim 1, which recites:

> 1. A shift register comprising multi-stage shift register units each of which comprises:
>
> at least one **pull-up driving module** for providing a driving signal according to a pulse signal;
>
> a **pull-up module** outputting an output signal according to one of a first signal and a second signal when the pull-up module is triggered by the driving signal to be electrically conductive;
>
> at least **one pull-down module** for providing the pull-up module with a first source voltage; and
>
> at least one **pull-down driving module** based on one of a third signal and a fourth signal, triggering the at least one pull-down module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge.

’934 Patent at 13:42–56. The parties dispute whether each of the claim’s “module” terms is a means-plus-function term and, if it is, the corresponding structure.

**B. U.S. Patent 8,208,084**

The ’084 Patent relates to the more efficient use of space on an array substrate. The patent explains that in then-conventional technology, both test shorting bars and repair lines are disposed on the substrate adjacent to the display area. Test shorting bars are “used for detecting whether the arrays on a mother substrate . . . [are] electrically connected or disconnected (for example, short circuit or open-circuited).” ’084 Patent at 4:37–40; *see also* Dkt. No. 55 at 3 (noting the parties’ agreed construction for “test shorting bar” of “a conductor that short-circuits, for testing purposes,

multiple data lines (or multiple gate lines) that are not shorted during normal operation”). “When a defect is detected in the pixel array, a specific signal provided by data driving circuits is transmitted to the pixel array through the path of the wires, such that the pixel array with the defect can remain operable at a certain level. Hence, the wires have the function of repairing the defect in the array substrate.” ’084 Patent at 5:3–9 (reference numbers omitted).

To more efficiently use the space on the substrate, the patent teaches combining part of one of the repair lines with one of the parts of a test shorting bar. Figure 1B (below) shows the conventional layout with two repair lines (130) distinct from two test shorting bars (120).



FIG. 1B (PRIOR ART)

Figure 2A (below) shows an embodiment of the invention, where one test shorting bar (220a) shares a common trace (240) with one of the repair lines (230).




FIG. 2A

The parties have two claim-construction disputes from this patent, both of which concern

Claim 1:

1. An array substrate having a display region and a peripheral circuit region adjacent to the display region, the array substrate comprising:

   a pixel array disposed in the display region;

   a plurality of test shorting bars disposed in the peripheral circuit region, wherein the test shorting bars comprises a first type test shorting bar and a second type test shorting bar, and wherein the first type test shorting bar comprises a first trace and a common trace; and

   a plurality of **wires** disposed in the peripheral circuit region and electrically **connected with** the pixel array, wherein each **wire** comprises a first signal source connection wire, the common trace and a pixel array connection wire, wherein the first trace of the first type test shorting bar is **connected with** one of first signal source connection wires and one of pixel array connection wires through the common trace, which is used for transmitting driving signals and test signals, and wherein the second type test shorting bar is not **connected with** any one of first signal source connection wire and any one of pixel array connection wire.

’084 Patent at 10:13–33 (emphasis added). The parties dispute whether the recited “wires” must be repair lines and the scope of “connected with.”

**C. U.S. Patent 8,502,757**

The ’757 Patent relates “to an organic light emitting display having [a] threshold voltage compensation mechanism and driving method thereof.” ’757 Patent at 1:10–12. The patent explains that, during operation of active matrix OLEDs, “the threshold voltage of the driving transistor has an effect on the driving current $I_d$, and therefore the threshold voltage variation of the driving transistors in the pixel units will cause pixel brightness distortion on the OLED screen, [] degrading display quality.” *Id.* at 1:40–46 (reference numbers omitted). The patent teaches circuits for and methods of compensating for the undesired voltage variation of the driving transistors.

All the disputes from this patent relate to Claim 1. Specifically, the parties dispute whether seven “unit” terms from the claim are means-plus-function terms. To the extent they are, the parties agree on the recited function and corresponding structure.

**D. U.S. Patent 8,604,471**

The ’471 Patent “relates to a semiconductor structure adapted to a light emitting device.” ’471 Patent at 1:19–20. The patent describes a problem resulting from using ultraviolet (UV) light irradiation during the LED packaging process or a UV-bleach process for active matrix liquid crystal displays (AMLCDs) or active matrix organic light emitting displays (AMOLEDs). These processes can negatively alter the characteristics of the circuit components. *See id.* at 1:29–39 (noting the device could have a current leakage phenomenon due to the drain induced barrier lowering (DIBL) effect).

As shown in Figure 1A (below), to address this problem, the patent teaches using a conductive light-shielding pattern layer (172) on a dielectric layer covering the source electrode (140),

the drain electrode (150), and the channel layer (130) of the device. '471 Patent at [57], fig.1A. The light shielding layer overlaps with a portion of the source electrode and a portion of the channel layer. This "mitigates influence on a thin film transistor caused by light irradiation" by "shield[ing] the light from directly irradiating the channel layer" while not covering the drain electrode. *Id.* at 3:8–13. "[I]f the light-shielding layer covers [the] drain electrode . . . , an extra electric field is generated during operation of the device, which may cause shift and decrease of a threshold voltage of the device driven by a high source voltage, and may also cause the current leakage phenomenon." *Id.* at 3:13–18. The patent teaches a specific amount of "covering" that purports to "balance [the] light-shielding effect and device performance." *Id.* at 3:19–21.




FIG. 1A

All the claim-construction disputes relate to Claim 1, which recites:

> 1. A semiconductor structure, **disposed on** a substrate, and comprising:
>
> a gate electrode, **disposed on** the substrate;
>
> a gate insulating layer, **disposed on** the substrate, and **covering** the gate electrode;
>
> a channel layer, **disposed on** the gate insulating layer and located above the gate electrode, wherein the channel layer has a channel length L along a channel direction and has a first

> side and a second side opposite to the first side;
>
> a source electrode and a drain electrode, located at the two opposite sides of the channel layer, and electrically connected to the first side and the second side of the channel layer, respectively;
>
> a dielectric layer, **covering** the source electrode, the drain electrode and the channel layer; and
>
> a conductive light-shielding pattern layer, **disposed on** the dielectric layer, and overlapped to a portion of the source electrode and a portion of the channel layer in a vertical projection, wherein the conductive light-shielding pattern layer does not overlap to the drain in the vertical projection, and the conductive light-shielding pattern layer and the channel layer have an overlapping length d1, and $0.3 \leq d1/L \leq 0.85$.

'471 Patent at 6:61–7:17. The parties dispute the meaning of the terms "disposed on" and "covering," as well as the scope of the term "conductive light-shielding pattern layer."

## II. LEGAL STANDARDS

### A. Generally

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). As such, if the parties dispute the scope of the claims, the court must determine their meaning. *See Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1317 (Fed. Cir. 2007) (Gajarsa, J., concurring in part); *see also Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996).

Claim construction, however, "is not an obligatory exercise in redundancy." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). Rather, "[c]laim construction is a matter of [resolving] disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims . . . ." *Id.* A court need not "repeat or restate every claim term in order to comply with the ruling that claim construction is for the court." *Id.*

When construing claims, "[t]here is a heavy presumption that claim terms are to be given their ordinary and customary meaning." *Aventis Pharm. Inc. v. Amino Chems. Ltd.*, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (citing *Phillips*, 415 F.3d at 1312–13). Courts must therefore "look to the words of the claims themselves . . . to define the scope of the patented invention." *Id.* (citations omitted). The "ordinary and customary meaning . . . is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, *i.e.,* as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1313. This "person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.*

Intrinsic evidence is the primary resource for claim construction. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) (citing *Phillips*, 415 F.3d at 1312). For certain terms, "the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Phillips*, 415 F.3d at 1314; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). But for claim terms with less-apparent meanings, courts consider "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean . . . [including] the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314.

### B. Means-Plus-Function Claiming

A patent claim may be expressed using functional language. *See* 35 U.S.C. § 112 ¶ 6 (pre-AIA); *Williamson v. Citrix Online*, *LLC*, 792 F.3d 1339, 1347–49 & n.3 (Fed. Cir. 2015) (en banc). Under 35 U.S.C. § 112 ¶ 6, a structure may be claimed as a "means . . . for performing a specified function," and an act may be claimed as a "step for performing a specified function." *Masco Corp. v. United States*, 303 F.3d 1316, 1326 (Fed. Cir. 2002). When it applies, § 112 ¶ 6 limits the scope of the functional term "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof." *Williamson*, 792 F.3d at 1347.

But § 112 ¶ 6 does not apply to all functional claim language. There is a rebuttable presumption that § 112 ¶ 6 applies when the claim language includes "means for" or "step for" terms, and a rebuttable presumption it does *not* apply in the absence of those terms. *Masco Corp.*, 303 F.3d at 1326; *Williamson*, 792 F.3d at 1348. These presumptions stand or fall according to whether one of ordinary skill in the art would understand the claim with the functional language to denote sufficiently definite structure or acts for performing the function in the context of the entire specification. *See Media Rights Techs., Inc. v. Capital One Fin. Corp.*, 800 F.3d 1366, 1372 (Fed. Cir. 2015) (noting § 112 ¶ 6 does not apply when "the claim language, read in light of the specification, recites sufficiently definite structure" (quotation marks omitted) (citing *Williamson*, 792 F.3d at 1349; *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1099 (Fed. Cir. 2014))); *Masco Corp.*, 303 F.3d at 1326 (noting § 112 ¶ 6 does not apply when the claim includes an "act" corresponding to "how the function is performed"); *Personalized Media Commc'ns, LLC v. I.T.C.*, 161 F.3d 696, 704 (Fed. Cir. 1998) (noting § 112 ¶ 6 does not apply when the claim includes "sufficient structure, material, or acts within the claim itself to perform entirely the recited function . . . even if the claim uses the term 'means.'" (quotation marks and citation omitted)).

Construing a means-plus-function limitation involves multiple steps. Step 1 "is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Step 2 "is to determine the corresponding structure described in the specification and equivalents thereof. Structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* (citations and quotations omitted). The corresponding structure "must include all structure that actually performs the recited function." *Default Proof Credit Card Sys. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005). But § 112 ¶ 6 does not permit "incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999).

**C. Indefiniteness**

"[A] patent is invalid . . . if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). The claims "must be precise enough to afford clear notice of what is claimed" while recognizing that "some modicum of uncertainty" is inherent due to the limitations of language. *Id.* at 909. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017). And in the context of § 112 ¶ 6, "[t]he party alleging that the specification fails to disclose sufficient corresponding structure must" show that "by clear and convincing evidence." *TecSec, Inc. v. IBM*, 731 F.3d 1336, 1349 (Fed. Cir. 2013) (quoting *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1380–81 (Fed. Cir. 2001)).

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

The level of ordinary skill in the art is the skill level of a hypothetical person who is presumed to have known the relevant art at the time of the invention. *In re GPAC*, 57 F.3d 1573, 1579 (Fed. Cir. 1995). In resolving a dispute about the appropriate skill level, courts consider the types of and solutions to problems encountered in the art, the speed of innovation, the sophistication of the technology, and the education of workers active in the field. *Id.* Importantly, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007).

Here, Optronic says a skilled artisan at the time of invention would have had "a bachelor's degree in engineering or physics, and at least two years of experience in the field relevant to electronic aspects of a flat panel display for the '934, '084, and '757 patents and relevant to semiconductor design of a display for the '471 patent." Dkt. No. 55 at 2 (citing Bretschneider Decl., Dkt. No. 55-6 ¶¶ 25–26). In contrast, BOE asserts a skilled artisan "would have had a Bachelor['s] degree in electrical engineering or a comparable field of study, plus approximately one or more years of professional experience with electronic and optoelectronic system design." Dkt. No. 56 at 1 (citing Neikirk Decl., Dkt. No. 55-8 ¶ 33). BOE objects to Optronic's characterization of an unspecific engineering degree as an attempt to encompass Dr. Bretschneider, who has degrees in chemical engineering. *Id.* Optronic complains BOE's characterization "includes virtually any electronics design experience, regardless of whether those electronics include display panels." Dkt. No. 55 at 2. In its analysis, the Court will resolve the differences between the parties' characterizations of a skilled artisan only to the extent necessary to resolve the disputes.

## IV. THE DISPUTED TERMS

### A. "pull-up module outputting an output signal according to one of a first signal and a second signal when the pullup module is triggered by the driving signal to be electrically conductive" ('934 Patent, Claim 1)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Not means-plus-function. Alternatively, if found to be means-plus-function:<br>(Disputed) Recited Function: outputting an output signal according to one of a first signal and a second signal when the pull-up module is triggered by the driving signal to be electrically conductive<br>(Disputed) Corresponding Structure:<br>1. Pull-up module 310 in Fig. 3A (5:53–6:6)<br>2. Pull-up module 310 in Fig. 3B (10:31–53)<br>3. Pull-up module 310 in Fig. 3C (11:21–43) | 35 U.S.C. § 112 ¶ 6<br>(Disputed) Function:<br>outputting an output signal **that is pulled up to a high positive voltage** according to one of a first signal and a second signal when the pullup module is triggered by the driving signal to be electrically conductive.<br>(Disputed) Corresponding Structure:<br>1. Pull-up module 310 in Fig. 3A ('934, **5:23–33; 5:37–48**; 5:53-6:19); or<br>2. Pull-up module 310 in Fig. 3B ('934**, 5:23–33; 5:37–48**; **5:53-6:19**; 10:31-53); or<br>3. Pull-up module 310 in Fig. 3C ('934, 5:**23–33; 5:37–48; 5:53–6:19**; 11:21–43) and equivalents. |

The parties dispute whether this phrase, which is the second limitation of Claim 1, is a means-plus-function term. If it is, the parties also dispute the corresponding function and structure. BOE agrees with the citations from the '934 Patent referenced by Optronic, but contends other citations (bolded *supra*) are also relevant.

#### *1. Whether this is a means-plus-function term*

After stressing the presumption against means-plus-function treatment stemming from absence of the word "means," Optronic says this term would be understood as "pull-up circuit." Dkt. No. 55 at 5. BOE responds that "module" is a nonce word and suggests Optronic's expert wrongly focuses on the pull-up *function* rather than the structure the phrase connotes. Dkt. No. 56 at 2.

The Court agrees with BOE. Optronic identifies no evidence for what structure the phrase "pull-up *module*" connotes to a skilled artisan. At most, Optronic's expert notes a "pull-up *circuit*"

is *typically* a transistor or resistor, Bretschneider Decl., Dkt. No. 55-6 ¶ 30, but the pull-up *modules* of the specification are more than just a single circuit component, are in a certain configuration, and potentially involve certain signals. Optronic's expert identifies what a skilled artisan would understand these modules *do*, but then wrongly concludes that because the function of pull-up transistors and pull-up resistors perform the same function, the structure is the same for "pull-up modules." *Id.* ¶ 31. That, however, is not the correct analysis for deciding whether § 112 ¶ 6 applies, as "module" potentially involves more than just a known circuit type or component. Accordingly, the Court holds that this is a means-plus-function term.

*2. The corresponding structure*

The parties generally agree on the corresponding structure for the "pull-up module." Each party identifies item 310 from each of Figures 3A–3C. BOE, however, suggests the Court identify three other excerpts from the specification as part of its construction to subvert what it considers Optronic's attempt to limit the corresponding structure to only the disclosed transistors and not the signals. *See* Dkt. No. 56 at 6 (accusing Optronic of "improperly limit[ing] the 'corresponding structure' to only the disclose NMOS transistors . . . but the recited functions are also performed in conjunction with . . . clocks or other signals whose rising or falling edges have very specific timing relative to one another"). Optronic replies those excerpts relate to circuit operation and functionalities rather than structure, so they should not be included. Dkt. No. 57 at 3.

Ultimately, the question is whether the corresponding structure includes one or more of the signals identified within the dashed box surrounding item 310 in the figures. Optronic agrees the structure at least includes the clock signal and source voltage, Dkt. No. 57 at 3 (noting "Optronic's citations already capture the corresponding structure (including signal CK or XCK [and $V_{ss}$])," but

says the setting signal STN should not be included because that's what's generated by the module when the recited function is performed, Hr'g Tr., Dkt. No. 83 at 11:13–18.

The Court agrees with Optronic on that point. As the patent explains with reference to the pull-up module 310 of Figure 3A:

> [T]he pull-up module 310 has a second transistor (T2), a third transistor (T3), an input node (Q) and an output node (OUT). The second transistor (T2) has a drain connected with one of a first signal (CK) and a second signal (XCK) (but only connected with the first signal (CK) in this embodiment), a gate connected with the input node (Q) of the pull-up module 310 for connecting to the driving signal, and a source connected with the output node (OUT) for generating an output signal as gate pulse signal ($OUT_1$~$OUT_{N+i}$). The third transistor (T3) has a drain connected with one of the first and second signals (CK and XCK), a gate connected with the input node (Q) of the pull-up module 310 for further connecting to the driving signal, and a source connected with the output point *for generating the setting signal (STN) to the next stage shift register unit 203a.*

'934 Patent at 5:54–6:1 (emphasis added). If generating the setting signal is the *result* of the claimed structure operating as intended, it cannot be part of the structure itself. In contrast, the clock signals are required structure for the module to perform that function. Accordingly, the Court holds the corresponding structure for this term is the pull-up module (310) shown in each of Figures 3A–3C, including the clock signals, but excluding the generated setting signal.[1]

[1] For each of these "module" terms, the Court would arrive at the same corresponding structure regardless of whether it adopted Optronic's or BOE's proposed function.

**B. "pull-down module for providing the pull-up module with a first source voltage" ('934 Patent, Claim 1)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Not means-plus-function. Alternatively, if found to be means-plus-function:<br>(Disputed) Recited Function:<br>Providing the pull-up module with a first source voltage<br>(Disputed) Corresponding Structure:<br>1. Pull-down module 320a in Fig. 3A (6:28–44)<br>2. Pull-down module 320b in Fig. 3A (7:18–39)<br>3. Pull-down module 320a in Fig. 3B (10:31–53)<br>4. Pull-down module 320b in Fig. 3B (10:31–53)<br>5. Pull-down module 320 in Fig. 3C (11:58–12:14) | 35 U.S.C. § 112 ¶ 6<br>(Disputed) Function:<br>providing the **claimed** "pullup module" with a voltage **that is pulled down to a constant negative or near-ground power supply voltage.**<br>(Disputed) Corresponding Structure:<br>1. Pull-down module 320a in Fig. 3A ('934, 6:28–44; **6:44–67**); or<br>2. Pull-down module 320b in Fig. 3A ('934, 7:18–39, **7:39–8:5**); or<br>3. Pull-down module 320a in Fig. 3B ('934, **6:45-67**; 10:31–53); or<br>4. Pull-down module 320b in Fig. 3B ('934, **7:40–8:5**; 10:31–53); or<br>5. Pull-down module 320 in Fig. 3C ('934, 11:58–12:14) and equivalents. |

As with the prior term, the parties dispute whether this phrase, which is the third limitation of Claim 1, is a means-plus-function term. If it is, the parties also dispute the corresponding structure.

*1. Whether this is a means-plus-function term*

The parties' arguments track those they make with respect to the "pull-up module" discussed *supra*. *See* Dkt. No. 55 at 4–8; Dkt. No. 56 at 2–6 (analyzing whether § 112 ¶ 6 applies for the "module" terms as a whole). For the same reasons, the Court holds § 112 ¶ 6 applies.

*2. The corresponding structure*

The parties agree the proper corresponding structure includes 320a and 320b from FIG. 3A and 3B, and item 320 shown in FIG. 3C. BOE says Optronic believes both item 320a and 320b in Figures 3A, as well as Figure 3B, together are the disclosed structure. Dkt. No. 56 at 10. The Court

doesn't read Optronic's briefing as requiring that, and Optronic denies that in its reply. *See* Dkt. No. 57 at 3 n.4. But for the avoidance of doubt, the Court agrees that each of item 320a or 320b by itself is corresponding structure.

BOE also cites two other sections of the patent that relate to operation of the pull-down module. Notably, both sections start with "in operation" and then explain how the disclosed embodiments work rather than what the corresponding structure is. Accordingly, it would be improper to include citations to those excerpts as part of the Court's construction because it could mislead the jury into thinking the claimed structure must operate a certain way.

### C. "pull-up driving module for providing a driving signal according to a pulse signal" ('934 Patent, Claim 1)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Not means-plus-function. Alternatively, if found to be means-plus-function:<br>(Agreed-Upon) Recited Function: providing a driving signal according to a pulse signal<br>(Disputed) Corresponding structure:<br>1. Pull-up driving module 300a in Fig. 3A (5:19–28; 5:37–43)<br>2. Pull-up driving module 300b in Fig. 3A (5:33–37; 5:48-52; 8:6-19)<br>3. Pull-up driving module 300a in Fig. 3B (10:40–42)<br>4. Pull-up driving module 300a in Fig. 3C (11:14–20)<br>5. Pull-up driving module 300b in Fig. 3C (12:15–46) | 35 U.S.C. § 112 ¶ 6<br>(Agreed-Upon) Function:<br>providing a driving signal according to a pulse signal<br>(Disputed) Corresponding Structure:<br>1. Pull-up driving module 300a in Fig. 3A ('934, 5:19–28; 5:37–43; **6:7–19**); or<br>2. Pull-up driving module 300a in Fig. 3B ('934, **5:19–28; 5:37–43; 6:7–19**); or<br>3. Pull-up driving module 300a in Fig. 3C ('934, **5:19–28; 5:37–43; 6:7–19**; 11:14-20) and equivalents.<br>BOE disagrees that 300b is corresponding structure; to the extent 300b is deemed appropriate then:<br>4. Pull-up driving module 300b in Fig. 3A ('934, 5:33–37; 5:48–52; 8:6–19)<br>5. Pull-up driving module 300b in Fig. 3C ('934, **5:33–37; 5:48–52; 8:6–19**; 12:15–46) |

As with the prior terms, the parties dispute whether this phrase, which is the first limitation of Claim 1, is a means-plus-function term. If it is, the parties also dispute the corresponding structure.

*1. Whether this is a means-plus-function term*

Here, too, the parties' arguments track those they make with respect to the prior terms discussed *supra*. Dkt. No. 55 at 9–12 (analyzing the "driving module" terms together); Dkt. No. 56 at 2–6 (collectively analyzing whether §112 ¶ 6 applies for the "module" terms). For the same reasons, the Court holds this is a means-plus-function term.

*2. The corresponding structure*

The parties only dispute whether the corresponding structure includes item 300b in Figures 3A and 3C. BOE says it shouldn't because that item does not perform the recited function. Dkt. No. 56 at 11–12. More specifically, it does not "provid[e] a driving signal according to a pulse signal," because it turns the pull-up module 310 off. Optronic disagrees, suggesting BOE wrongly limits the scope of "driving signal" to only a signal that makes the pull-up module electrically conductive. Dkt. No. 55 at 11.

The Court agrees with BOE. Neither party cites evidence about the scope of "driving signal." Notably, however, the specification only refers to "generating a driving signal" with reference to item 300a. *See* '934 patent at 11:14–20 (noting the first pull-up driving module 300a has "a source for *generating a driving signal*" (emphasis added)). In contrast, "[t]he second pull-up driving module 300b . . . connects a first source voltage (VSS1) to turn off the pull-up module 310." *Id.* at 5:32–35. "Generating a driving signal" and "connect[ing] a first source voltage," which BOE says is ground or near ground,[2] are fundamentally different acts. Accordingly, item 300b is not

[2] *See* Dkt. No. 56 at 14 (asserting the "first source voltage" is a "constant negative or near-ground power supply voltage").

clearly linked to the function of "providing a driving signal according to a pulse signal," so it cannot be corresponding structure.

### D. "pull-down driving module based on one of a third signal and a fourth signal, triggering the at least one pull-down module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge" ('934 Patent, Claim 1)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Not means-plus-function. Alternatively, if found to be means-plus-function:<br>(Agreed-Upon) Recited Function: based on one of a third signal and a fourth signal, triggering the at least one pull-down module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge<br>(Disputed) Corresponding Structure:<br>1. Pull-down driving module 330a in Fig. 3A (6:20–27)<br>2. Pull-down driving module 330b in Fig. 3A (7:1–17)<br>3. Pull-down driving module 330a in Fig. 3B (10:31–53)<br>4. Pull-down driving module 330b in Fig. 3B (10:31–53)<br>5. Pull-down driving module 330 in Fig. 3C (11:44–57) | 35 U.S.C. 112 ¶ 6<br>(Agreed-Upon) Function: based on one of a third signal and a fourth signal, triggering the at least one pull-down module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge.<br>(Disputed) Corresponding Structure:<br>1. Pull-down driving module 330a in Fig. 3A ('934, 6:2027; **6:45–47; 8:26–9:17**); or<br>2. Pull-down driving module 330b in Fig. 3A ('934, 7:117; **8:26–9:17**); or<br>3. Pull-down driving module 330a in Fig. 3B ('934, **6:45–47; 8:26–9:17**; 10:31–53); or<br>4. Pull-down driving module 330b in Fig. 3B ('934, **8:26–9:17**; 10:31–53); or<br>5. Pull-down driving module 330 in Fig. 3C ('934, 11:44-57; **12:57–13:15**) and equivalents. |

As with the three prior terms, the parties dispute whether this phrase, which is the last limitation of Claim 1, is a means-plus-function term. If it is, the parties also dispute the corresponding structure.

#### 1. *Whether this is a means-plus-function term*

Once again, the parties' arguments track those they make with respect to the terms discussed *supra*. For the same reasons, the Court holds this is a means-plus-function term.

### 2. *The corresponding structure*

This dispute is similar to the dispute about signals in Part IV.A. BOE says the corresponding structure includes the signals P_CK, P_XCK shown within the dotted boxes identifying items 330a, 330b, and 330. Dkt. No. 56 at 12–13. As noted *supra*, *see* Part IV.A., Optronic agrees they do. Dkt. No. 57 at 3 (noting its "citations already capture the corresponding structure (including signal CK or XCK [and $V_{ss}$]"). The Court therefore holds the corresponding structure is item 330a, 330b, or 330, along with the clock signals.

## E. "triggering the at least one pulldown module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge" ('934 Patent, Claim 1)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning; not indefinite | Indefinite because the term has several possible constructions, and therefore fails to inform those skilled in the art about the scope of the invention with reasonable certainty. |

BOE says this phrase is indefinite because it is unclear for a number reasons. Dkt. No. 56 at 29. BOE agrees, however, that the term is not indefinite if the disclosed corresponding structure for "pull down driving module" includes the P_CK and P_XCK signals. *Id.* at 30 ("Were the Court to include those signals as corresponding structure, then the meaning and context of this 'triggering . . .' function would be clear and BOE would withdraw its allegation of indefiniteness."). Because those signals are part of the corresponding structure, this dispute is moot and the term is not indefinite.

**F. "rising edge" and "falling edge" ('934 Patent, Claim 1)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning.<br>(when a wave form rises or falls, Dkt. No. 55 at 14) | Plain and ordinary meaning, which is "a nearly instantaneous transition from a negative or near-ground voltage to a high positive voltage." |

The last limitation of Claim 1 recites:

> at least one pull-down driving module based on one of a third signal and a fourth signal, triggering the at least one pull-down module for a specific period before a waveform of either the first signal or the second signal transits into either a *rising edge* or a *falling edge*.

'934 Patent at 13:51–56 (emphasis added).

The parties dispute whether the ordinary meanings of these "edge" terms require a "nearly instantaneous transition" from a low to high voltage, in the case of a "rising edge," and from a high to low voltage, in the case of a "falling edge." Optronic says the ordinary meanings of these terms are simply when a waveform rises or falls. Dkt. No. 55 at 14. In its view, BOE's construction imports limitations into the terms' ordinary meanings. *Id.* It also questions the certainty of "nearly instantaneous" and the magnitude of the change. *Id.* BOE responds that "[a] slowly rising or falling voltage does not have an 'edge' under the ordinary meaning and could not be used for timing purposes." Dkt. No. 56 at 13.

As an initial matter, the intrinsic evidence cited by the parties doesn't resolve the dispute. Optronic cites the specification's disclosure that clock waveforms transit into either "a rising edge from a low level to a high level" or "a falling edge from a high level to a low level." Dkt. No. 55 at 14. But that does not inform the meaning of the terms, as there is no dispute that signal edges do one or the other of these. The issue is the speed of the transition. BOE, on the other hand, simply

points to the figures, but doesn't explain how they inform the meaning of the term. BOE asserts, without support, that the ordinary meaning of "edge" requires a near instantaneous transition. Dkt. No. 56 at 13.

At the hearing, the Court proposed a preliminary construction of "a transition of a digital signal from low to high" for "rising edge" and "a transition of a digital signal from high to low" for "falling edge." Objecting to that construction, Optronic stressed the specification doesn't use the word "digital" and suggested the disclosure of a "gray" signal shows the signal is not limited to digital signals. *See* Hr'g Tr., Dkt. No. 83 at 19:8–22–14. BOE, however, agreed "digital" is appropriate and says the "gray" signal to which Optronic refers is unrelated to the dispute, even if it is an analog signal. *Id.* at 22:17–25:7.

Based on the limited evidence provided by the parties on this term, the Court agrees with BOE. A skilled artisan would understand a signal "edge" as relating to digital signals. A skilled artisan would not, however, consider a sine wave to have rising and falling "edges." Moreover, even if the "gray" signals referenced by Optronic are analog signals, the "rising edge" and "falling edge" are not used to describe them, so a construction limiting these terms to digital signals is not inconsistent with the specification. The Court construes (1) "rising edge" as "a transition of a digital signal from low to high"; and (2) "falling edge" as "a transition of a digital signal from high to low."

### G. "first source voltage" ('934 Patent, Claim 1)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. | Plain and ordinary meaning, which is "constant negative or near-ground power supply voltage. |

Claim 1 recites "at least one pull-down module for providing the pull-up module with a first source voltage[.]" '934 Patent at 13:50–51. The parties dispute whether the "first source voltage" must be a specific value—"negative or near ground." Saying it must, BOE cites the specification and its expert's opinion that the claimed "pulled down" function means the voltages are being pulled down to ground. Dkt. No. 56 at 13–14. BOE says this is consistent with the specification's explanation that "the first source voltage is too low to [turn on] the disclosed NMOS transistors, meaning that it is near ground." *Id.* at 14.

The Court agrees with Optronic. Effectively, BOE seeks to limit the scope of the claim and this term to disclosed embodiments with specific values. While it may be true that the disclosed embodiments require a negative or near-ground voltage to operate, nothing about the term itself is limited to a certain value. Accordingly, the Court will give this term its plain and ordinary meaning.

### H. "wire" ('084 Patent, Claims 1, 2)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning. | "a repair line" |

This dispute concerns lexicography. Claim 1 recites "a plurality of **wires** disposed in the peripheral circuit region and electrically connected with the pixel array." '084 Patent at 10:22–23 (emphasis added). According to BOE, the intrinsic record defines a "wire" as "a repair line." The patent, says BOE, distinguishes "the present invention and the conventional technology" because "the wires 230 (or called repair lines) and the test shorting bars 220 in the array substrate 200 share

a part to save the space." Dkt. No. 56 at 14–15 (quoting '084 Patent at 6:53–57). BOE stresses the specification's disclosure that "the wires 230 have the function of repairing the defect in the array substrate 200. In other words, the wires 230 are also called repair lines." '084 Patent at 5:7–9. BOE also points to the prosecution history, in which the applicants amended Claim 1 to require that the wire include several features. Dkt. No. 56 at 15. Optronic replies that the specification is too ambiguous for lexicography. Dkt. No. 57 at 6.

The Court agrees with BOE. Most persuasively, the specification explains "[t]he difference between the present invention and the conventional technology lies in that the wires 230 (or called 55 repair lines) and the test shorting bars 220" share a part to save space. In other words, unlike the repair lines of the prior art, the repair lines *of the invention* allow more space-efficient use of the substrate. The inventor's own declaration submitted during prosecution underscores this distinction, calling the "rescue line" "the wire recited in Claim 1." Lin Decl., Dkt. No. 56-5 at 2. Further, the applicant characterized "[t]he present invention" as:

> setting the tester shorting line to share a part with the rescue line in the outer region of the chip to save the layout space of rescue line, so as to narrow the chip size and reduce the resistance of rescue line (the width of shorting bar line is usually wide), and thus cutting the substrate more economically and enhance the utility rate of substrate.

*Id.* at 3.[3]

In addition to disputing the presence of sufficiently clear lexicography or disclaimer, Optronic contends BOE's construction would exclude the embodiment of Figure 2 because it would exclude use of that figure's "wires" for testing purposes. Dkt. No. 55 at 17 (citing '084 Patent at

---

[3] Despite Optronic's assertion to the contrary, the Court sees no distinction between "rescue line" and "repair line."

4:30–44); *see also* Hr'g Tr., Dkt. No. 83 at 28 (asserting BOE's construction "would read out a preferred embodiment of the wires being used for driving signals under normal operation; not just when there is a repair that is needed"). BOE, however, does not contend the "repair line" could not be used for other purposes. Instead, BOE says the wire simply must have that repair capability. *See* Hr'g Tr., Dkt. No. 83 at 32:20–23. Because the Court agrees, it construes these two instances of "wire" as "repair line or segment of a repair line."

### I. "connected with" ('084 Patent, Claims 1, 8)

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning.<br>"conductive connectedness" (e.g., not through atmosphere) | Plain and ordinary meaning, which encompasses direct or indirect connection |

BOE says Claim 1 requires that "connected with" include "indirectly connected with." If it doesn't, says BOE, Claim 1 is invalid. Dkt. No. 56 at 16. Optronic replies the term has an ordinary meaning in context of this patent of "conductive connectedness." Dkt. No. 57 at 6.

The Court agrees with Optronic. BOE treats "connected with" as "*physically* connected with," but the context of the claim and the technology suggest "electrically connected with," or as Optronic puts it "conductively connected with." Indeed, that phrase is found throughout the patent. *See, e.g.*, '084 Patent at [57] ("The wires electrically connected with the pixel array"), 3:19–20 ("The second signal source connection wire is *electrically connected with* a gate driving circuit"), 3:37–39 ("The second traces and the dummy second traces are respectively *electrically connected with* the test shorting bars and the gate driving circuits."), 4:42–44 ("The test shorting bars 220 and the wires 230 are disposed in the peripheral circuit region P2, and the wires 230 are *electrically*

*connected with* the pixel array 210."). Accordingly, the Court construes this term as "electrically connected with."

**J. "an input unit, electrically connected to the data line and the first scan line, for outputting a preliminary control voltage according to the data signal and the first scan signal" ('757 Patent, Claim 1)**

**"a voltage adjustment unit, electrically connected to the transmission line and the input unit, for adjusting the preliminary control voltage according to the emission signal and a second reference voltage" ('757 Patent, Claim 1)**

**"a driving unit, electrically connected to the couple unit, for providing a driving current and a driving voltage according to the control voltage and a first power voltage" ('757 Patent, Claim 1)**

**"a couple unit, electrically connected to the input unit and the voltage adjustment unit, for adjusting a control voltage through coupling a change of the preliminary control voltage" ('757 Patent, Claim 1)**

**"a first reset unit, electrically connected to the driving unit and the second scan line, for resetting the driving voltage according to the second scan signal and a first reference voltage" ('757 Patent, Claim 1)**

**"a second reset unit, electrically connected to the driving unit, the first reset unit and the first scan line, for resetting the control voltage according to the first scan signal and the driving voltage" ('757 Patent, Claim 1)**

**"an emission enable unit, electrically connected to the transmission line, the driving unit and the organic light emitting diode, for providing a control of furnishing the driving current to the organic light emitting diode according to the emission signal" ('757 Patent, Claim 1)**

The parties only dispute whether these terms are means-plus-function terms. If they are, the parties agree on the recited function and structure for each term. Optronic relies on the presumption against § 112 ¶ 6 treatment due to the lack of the word "means." Dkt. No. 55 at 20. It then says each of the "unit" terms are "expressed in terms of specific circuitry (*i.e.*, structure) required to implement the claimed 'unit,'" and that they "cannot be achieved in a generic way, but must be performed using the specific combination of transistors and capacitors as disclosed in the

patent." *Id.* at 20–21. BOE responds that Optronic fails to show the terms connote specific structure. Dkt. No. 56 at 18.

The Court agrees with BOE. Despite the presumption against means-plus-function treatment, Optronic does not attempt to show these "units" connote *specific* structure or a specific class of structures to a skilled artisan. Instead, Optronic argues that each "unit" is structure of some sort as opposed to, for example, software. *See* Dkt. No. 57 at 7 (arguing "the intrinsic record . . . demonstrates that the 'unit' terms are structural because they refer to components of a circuit"). But the test is whether a skilled artisan would understand the term as a *name* for structure, not whether a skilled artisan would understand the limitation as something physical.

Here, that Optronic points back to the specification's disclosure as evidence the terms are structure supports the application of § 112 ¶ 6. Otherwise, Optronic should have been able to point to other evidence showing what specific structure a skilled artisan would understand these terms to be. Accordingly, the Court holds these are means-plus-function terms.

**K. "disposed on" / "covering" / "a gate insulating layer, disposed on the substrate, and covering the gate electrode" ('471 Patent, Claim 1)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning | Plain and ordinary meaning, where the directionality of these orientation terms is understood based on the substrate as a starting reference point such that the location of the substrate defines the "bottom" of the overall semiconductor structure. |

Claim 1 recites:

> 1. A semiconductor structure, **disposed on** a substrate, and comprising:
>
> a gate electrode, **disposed on** the substrate;
>
> a gate insulating layer, **disposed on** the substrate, and **covering** the gate electrode;

> a channel layer, **disposed on** the gate insulating layer and located **above** the gate electrode . . .
>
> a source electrode and a drain electrode, located at the two opposite sides of the channel layer, and electrically connected to the first side and the second side of the channel layer, respectively;
>
> a dielectric layer, **covering the source electrode, the drain electrode and the channel layer**; and
>
> a conductive light-shielding pattern layer, disposed on the dielectric layer, and overlapped to a portion of the source electrode and a portion of the channel layer in a vertical projection . . . .

’471 Patent at 6:61–7:18.

The parties’ positions present two distinct issues: (1) whether these terms require some direction relative to something else, and (2) if so, what is that “something else”? BOE says these terms show the claim is directed to “a substrate with layers built thereon.” Dkt. No. 56 at 24. BOE notes Optronic’s agreement with its position as to other claim terms, and points to Optronic’s position in another case between the parties pending before the Court. *Id.* at 25. Finally, BOE asserts Optronic’s position results in two dependent claims having identical scope. *Id.*

Optronic, however, says the intrinsic record doesn’t require these terms to have a specific orientation. Dkt. No. 55 at 24. It provides the example of wax film and a paper cup—“there can be a wax film ‘disposed on’ or ‘covering’ a paper cup without any requirement that the film be oriented above or below the cup.” *Id.* It agrees “any directionality would be based on the substrate,” Hr’g Tr., Dkt. No. 83 at 47:7–9, but says “these terms themselves do not inherently convey an orientation,” *id.* at 48:22–24.

The Court agrees with BOE. For one thing to be “disposed on” another imposes a relative position between the two things. *See dispose*, http://www.yourdictionary.com/dispose (“To place

in a certain order or arrangement.”). Moreover, “on” is a directional term. *See on*, http://www.yourdictionary.com/dispose (“In a position above, but in contact with and supported by; upon.”; “In contact with (any surface); covering or attached to.”). Similarly, for one thing to be “covering” another in this context suggests some relative direction. At the hearing, Optronic analogized to lay usage of these terms, suggesting “[t]he monitor is *disposed on* the wall and the table is *disposed on* the floor, and a shoe is *covering* my foot,” Dkt. No. 83 at 45:14–16 (emphasis added), but in this art “the substrate or starting material is considered ‘down’ and subsequent material layers are added to or formed ‘above’ [the] base or substrate,” Brettschneider Decl., Dkt. No. 56-7.

The Court therefore adopts a “plain and ordinary meaning” construction for this term, but notes these terms convey an orientation. The directionality of these orientation terms is understood based on the substrate as a starting reference point such that the location of the substrate defines the “bottom” of the overall semiconductor structure.

**L. “wherein the channel layer has a channel length L along a channel direction and has as first side and a second side opposite to the first side” (’471 Patent, Claim 1)**

| Plaintiff’s Construction | Defendant’s Construction |
| --- | --- |
| Plain and ordinary meaning | “wherein L is the length of the entire channel layer as measured along a channel direction from a first side to a second side opposite the first side” |

Claim 1 recites:

> a channel layer, disposed on the gate insulating layer and located above the gate electrode, wherein the channel layer has a channel length L along a channel direction and has a first side and a second side opposite to the first side[.]

’471 Patent at 6:66–7:3.

According to BOE's response brief, the parties dispute whether "channel length" means the length of the channel layer, or whether it means the length of the "channel" within the layer. Dkt. No. 56 at 26. Optronic, however, agrees with the substance of BOE's construction, calling it is unnecessary because it does little more than add the word "entire" to the claim language. Dkt. No. 57 at 9–10. Instead, Optronic says BOE's construction is "potentially confusing" because the length of the channel can change depending on the applied voltages. *Id.* at 10.

The Court agrees with BOE. There appears to be no dispute "channel length L" refers to the length of the "channel layer" rather than the length of a "channel" within the layer. Hr'g Tr., Dkt. No. 83 at 53:22–25 (noting it "became clear during the briefing [that] the parties really agreed to the substantive meaning of this phrase and that it is the length of the channel layer"). Also, that the channel length might change over time, as Optronic suggests, doesn't change what is being measured, only its value at the time of measurement. That said, the Court agrees with Optronic that "entire" in BOE's construction is unnecessary, as the length of something is inherently the length of its entirety. Accordingly, the Court construes the phrase as "wherein L is the length of the channel layer as measured along a channel direction from a first side to a second side opposite the first side."

**M. "a conductive light-shielding pattern layer" ('471 Patent, Claim 1)**

| Plaintiff's Construction | Defendant's Construction |
|---|---|
| Plain and ordinary meaning, which is "a conductive pattern layer that blocks directly irradiating light" | Plain and ordinary meaning, which is "a pattern layer with material properties that are conductive and light-shielding where the pattern layer does not need to actually perform either function" |

Claim 1 requires "*a conductive light-shielding pattern layer*, disposed on the dielectric layer, and overlapped to a portion of [a] source electrode and a portion of [a] channel layer in a vertical projection[.]" '471 Patent at 7:10–13. The parties dispute whether this limitation requires performing the function of blocking directly irradiating light. Notably, BOE's construction would allow a supposed "conductive light-shielding pattern layer" to be located anywhere within the accused structure, even if it wasn't possible for that layer to be exposed to light, if it had the required material properties and was disposed on a dielectric layer. For example, any layer of metal film located anywhere within an accused device could potentially fall within the scope of this term based on material properties alone.

The Court agrees with Optronic. That the layer is "light-shielding" suggests its position within the claimed structure must be capable of being exposed to light. Although Optronic's construction frames such a requirement in terms of function—that it "blocks" the light—that effectively imposes the appropriate structural limitation. The Court construes this term "a conductive pattern layer that blocks directly irradiating light."[4]

[4] BOE urges the Court, if it does not adopt BOE's construction, to construe the term as "a conductive pattern that shields the light from directly irradiating the channel layer." Hr'g Tr., Dkt. No. 83 at 57:19–21. The Court, however, agrees with Optronic that other limitations of the claim concern that functionality, such as the limitation that the layer be "overlapped to a portion of the source electrode and a portion of the channel layer in a vertical projection," '471 Patent at 7:11–13. *See also* H'rg Tr., Dkt. No. 83 at 59:9–11 (noting any difference in scope between the parties' proposals "is captured in other elements of the claim").

## V. CONCLUSION

| Disputed Term | The Court's Construction |
|---|---|
| "pull-up module outputting an output signal according to one of a first signal and a second signal when the pullup module is triggered by the driving signal to be electrically conductive"<br>('934 Patent, Claim 1) | Governed by 35 U.S.C. § 112 ¶ 6<br>**Function:** outputting an output signal according to one of a first signal and a second signal when the pull-up module is triggered by the driving signal to be electrically conductive<br>**Structure:** pull-up module 310 in each of Fig. 3A–3C, including the clock signals |
| "pull-down module for providing the pull-up module with a first source voltage"<br>('934 Patent, Claim 1) | Governed by 35 U.S.C. § 112 ¶ 6<br>**Function:** providing the pull-up module with a first source voltage<br>**Structure:**<br>1. Pull-down module 320a in Fig. 3A<br>2. Pull-down module 320b in Fig. 3A<br>3. Pull-down module 320a in Fig. 3B<br>4. Pull-down module 320b in Fig. 3B<br>5. Pull-down module 320 in Fig. 3C |
| "pull-up driving module for providing a driving signal according to a pulse signal"<br>('934 Patent, Claim 1) | Governed by 35 U.S.C. § 112 ¶ 6<br>**Function:** providing a driving signal according to a pulse signal.<br>**Structure:**<br>1. Pull-up driving module 300a in Fig. 3A<br>2. Pull-up driving module 300a in Fig. 3B<br>3. Pull-up driving module 300a in Fig. 3C |

| | |
|---|---|
| "pull-down driving module based on one of a third signal and a fourth signal, triggering the at least one pull-down module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge"<br>('934 Patent, Claim 1) | Governed by 35 U.S.C. 112 ¶ 6<br>**Function:** based on one of a third signal and a fourth signal, triggering the at least one pull-down module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge.<br>**Structure:**<br>1. Pull-down driving module 330a in Fig. 3A, including the clock signals<br>2. Pull-down driving module 330b in Fig. 3A, including the clock signals<br>3. Pull-down driving module 330a in Fig. 3B, including the clock signals<br>4. Pull-down driving module 330b in Fig. 3B, including the clock signals<br>5. Pull-down driving module 330 in Fig. 3C, including the clock signals |
| "triggering the at least one pulldown module for a specific period before a waveform of either the first signal or the second signal transits into either a rising edge or a falling edge"<br>('934 Patent, Claim 1) | Not indefinite |
| "rising edge"<br>('934 Patent, Claim 1) | "a transition of a digital signal from low to high" |
| "falling edge"<br>('934 Patent, Claim 1) | "a transition of a digital signal from high to low" |
| "first source voltage"<br>('934 Patent, Claim 1) | Plain and ordinary meaning |
| "wire"<br>('084 Patent, Claims 1, 2) | "repair line or segment of a repair line" |
| "connected with"<br>('084 Patent, Claims 1, 8) | "electrically connected with" |

| | |
|---|---|
| "an input unit, electrically connected to the data line and the first scan line, for outputting a preliminary control voltage according to the data signal and the first scan signal" (757 Patent, Claim 1) | 35 U.S.C. § 112 ¶ 6 |
| "a voltage adjustment unit, electrically connected to the transmission line and the input unit, for adjusting the preliminary control voltage according to the emission signal and a second reference voltage" ('757 Patent, Claim 1) | 35 U.S.C. § 112 ¶ 6 |
| "a couple unit, electrically connected to the input unit and the voltage adjustment unit, for adjusting a control voltage through coupling a change of the preliminary control voltage" ('757 Patent, Claim 1) | 35 U.S.C. § 112 ¶ 6 |
| "a driving unit, electrically connected to the couple unit, for providing a driving current and a driving voltage according to the control voltage and a first power voltage" ('757 Patent, Claim 1) | 35 U.S.C. § 112 ¶ 6 |
| "a first reset unit, electrically connected to the driving unit and the second scan line, for resetting the driving voltage according to the second scan signal and a first reference voltage" ('757 Patent, Claim 1) | 35 U.S.C. § 112 ¶ 6 |
| "a second reset unit, electrically connected to the driving unit, the first reset unit and the first scan line, for resetting the control voltage according to the first scan signal and the driving voltage" ('757 Patent, Claim 1) | 35 U.S.C. § 112 ¶ 6 |

| | |
|---|---|
| "an emission enable unit, electrically connected to the transmission line, the driving unit and the organic light emitting diode, for providing a control of furnishing the driving current to the organic light emitting diode according to the emission signal"<br>('757 Patent, Claim 1) | 35 U.S.C. § 112 ¶ 6 |
| "disposed on" / "covering" / "a gate insulating layer, disposed on the substrate, and covering the gate electrode"<br>('471 Patent, Claim 1) | Plain and ordinary meaning |
| "wherein the channel layer has a channel length L along a channel direction and has a first side and a second side opposite to the first side"<br>('471 Patent, Claim 1) | "wherein L is the length of the channel layer as measured along a channel direction from a first side to a second side opposite the first side" |
| "a conductive light-shielding pattern layer"<br>('471 Patent, Claim 1) | "a conductive pattern layer that blocks directly irradiating light" |

The Court **ORDERS** each party not to refer, directly or indirectly, to its own or any other party's claim-construction positions in the presence of the jury. Likewise, the Court **ORDERS** the parties to refrain from mentioning any part of this opinion, other than the actual positions adopted by the Court, in the presence of the jury. Neither party may take a position before the jury that contradicts the Court's reasoning in this opinion. Any reference to claim construction proceedings is limited to informing the jury of the positions adopted by the Court.

**SIGNED this 28th day of December, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE